We have two cases for oral argument this morning. And the first case is Agenda No. 11, No. 130-042, Donald James et al. v. Geneva Nursing and Rehabilitation Center. Counsel for the Appellant, are you prepared to proceed? I am. Good morning, Your Honors. Good morning, Counsel. May it please the Court. My name is Christopher Wormald, and I am here today with my colleagues Michael Leonard, Margaret Battersby, and Gabriela Prodi. We collectively represent the Estates, the Executives of the Estates of Lucille James, Rose Doneski, Jack DeFrancesco, Marion Piotas, and Carol Orlando. Your Honors, we are here today to ensure that the true intent of Governor Pritzker when he issued Executive Order 2019 is recognized and employed in the manner that he intended, as well as a manner that avoids inconvenience, absurdity, and injustice. Counsel, you talk about ensuring that the true intent of the Governor's order is followed. Is that a concession that the plain language of the order does not necessarily read in the way that you would like it to, or that would support your position in this matter? Your Honor, I would say to that question, and I appreciate your question, is that we believe that the order is clear. However, I think it is also fair to say that it's ambiguous, and we should refer to the Candidates of Statutory Construction in order to discern what, in fact, was actually intended with respect to the scope of the immunity that EO 2019 is conveying. May I ask another foundational question? Of course. I'm kind of a back-to-basis person. Okay. This case comes to us in an unusual procedure, posture. This is not a case that was tried. This is not a final judgment. It came here pursuant to Supreme Court Rule 308, a very narrow type of procedure of certified questions. And the rule indicates that a court, a trial court, if the trial court determines that there is a question of law, not fact, that the resolution of that issue could materially advance the ultimate termination of litigation. The court shall so state in writing, identifying the question of law involved. Now, we know the trial court framed the certified question in a certain way, and I'm not sure if the parties participated in that. But anyway, that question went to the appellate court. It's a permissive appeal. They took the case, and then they said the question as drafted in the trial court was, I think they said, incorrect. And they modified the question to be answered. Now, we have to write an opinion. And I think if you look at every 308 opinion, there's a paragraph that says the issue before us is colon, a yes or no question. And the last line, the judgment line of every 308 appeal is certified question answered affirmatively or negatively. So here's my question to you, very precisely. What is the question before this Court? The question is the origin of the question that should be before this Court. And what we ask the Court to answer is the original question, which addressed the scope of the immunity with respect to the. What does blanket immunity mean? Blanket immunity. I mean, in other words, so that we're clear. Of course. The original question said, drafted by the Court, suggested that, said that the issue was whether or not there is blanket immunity, a term of art that was used in the question, pursuant to this executive order. Can you, how do you define blanket immunity as it's defined? And you're telling us we're supposed to decide that question. What does that mean? I am. So I think you have to also consider the entirety of the language that was employed in the original certified question. It was blanket immunity for ordinary negligence. Now, we can see it in our brief that that may not have been the greatest way to phrase the question, but what the purpose of the question was as phrased was to get down at that issue that I stated originally. What was the scope? Everybody that participated. When you say scope, again, we usually talk about scope of immunity being limited or absolute. Right. Is that what you're talking about? I am talking about whether there are any limitations with respect to ordinary claims of negligence. The parties all understand and concede and recognize that willful and wanton conduct is an express stated exception, but is there anything else beyond that? Or is the immunity the governor conveyed with executive order 2019 limited in a further degradation? So we go back to does the executive order provide blanket immunity for ordinary negligence to health care facilities that rendered assistance to the state during the COVID-19 pandemic? That's the question you're asking us to answer, correct? That is, that is. Your honors, the governor never intended to immunize the broad swath of injuries and deaths that were unrelated to the provision of COVID-19 assistance. And the first reason for that is the language of the executive order plainly demonstrates that Governor Pritzker targeted the immunity he was conferring to be limited to injuries or deaths that were related to the provision of COVID-19 assistance. Counsel, I have a question. Does the immunity that you're talking about flow from the governor's executive order or the Illinois Emergency Management Act? The Emergency Management Act is the mechanism that provides the governor with the authority, but the governor doesn't have to use the full extent of whatever authority he's bestowed through the Emergency Management Act. That's not exactly my question. One or the other will confer the immunity. Which one is it? It's the language of the executive order. And not the Emergency Management Act? No, the Emergency Management Act is just the mechanism that provides him the authority to issue the executive order. But you have to look at the language of the executive order to determine what in fact was being targeted, what type of immunity Governor Pritzker was conveying. Now, Counsel, you're talking about the scope, and let's take a look at the language of the governor's order. When it says that when a health care facility was engaged in the course of rendering assistance to the state by providing health care services in response to the COVID-19 outbreak, that sounds very general and broad. I would agree that health care services by itself, that is not defined. But what rendering assistance constitutes, we would have to first look at Section 2 of Executive Order 2019. And what that tells us is that rendering assistance in support of the state's response must include certain measures. There's three of them that are identified. It's adding bags, preserving PPE, and taking steps to prepare to treat patients with COVID-19. But rendering assistance doesn't stop there, because you need to then go to Section 3 of the executive order, which states that rendering assistance to the state by providing health care services in response to the COVID-19 outbreak. So that's where we get our relatedness requirement that we believe exists in the executive order. So the first three things that are outlined in Section 2 are, in essence, prerequisites. You have to do one of those three things, but in addition to that, you actually have to provide COVID assistance in order to receive the benefit of the immunity Governor Pritzker was conveying. Did all of the plaintiffs die from COVID-related complications? They did, Your Honor. All of the plaintiffs did die from COVID. That's correct. But their contraction of COVID did not occur at a time that Berea Health Services of Geneva was rendering assistance to the state. So that's the important distinction to make here, is that in order for the negligent act that resulted in the injury or death to be immunized for ordinary negligence, it would have to have occurred at the time that the health care facility was rendering assistance to the state. And rendering assistance as defined by the three things you just went over with us, weren't they doing some of that at the time that the people passed away? No, they weren't. They weren't reserving beds? They weren't engaging in protective measures related to COVID? No, I think the deposition testimony of Patty Long, who was the administrator of Berea, poked holes in that affidavit that was provided. But again, what they did, it's not just a simple act of adding a bed or storing PPE or preparing to treat COVID. You actually have to do it. So that's the first box that has to be checked. But then there has to be some sort of affirmative measure in order to close that loop and procure the limited immunity that's being bestowed. Aren't those fact questions, though? Isn't that for the trial, what these health facilities did or didn't do? And this is a purely question of law that's not grounded in the specific facts of the case. The question of law, as you've told us, is we are to interpret what does it mean in the course of rendering assistance to the state by providing health care services in response to the COVID-19 outbreak. That's an abstract, you know, de novo reviewed question of law. And I would agree with you as to that statement, Chief Justice, that whether Berea was in fact rendering assistance or whether they can procure the benefit of that limited immunity, that is a fact of intensive inquiry. But that's not what the question was addressing. The question was asking a legal question with respect to what the scope was and were there any limitations beyond that notable exception for World War I and World War II. What's the status of the 2619 motion to dismiss? That was denied. The 2619 motion to dismiss was denied. The court indicated that it's a question of fact as to whether rendering assistance was actually provided. And then Judge Bowles had indicated that at least that there is a question as to what constitutes rendering assistance or what the scope of the immunity was. So she certified that question. But the 2619 motion was denied. Your Honor, the most reliable indicator of Governor Pritzker's intent is the language he employed when he issued the executive order. That language is to be given its plain and ordinary meaning. The title of the executive order states that it's an executive order in response to COVID-19. And the preamble goes on to state that one of the purposes is to ensure the state of Illinois has adequate bed capacity, supplies, and providers to treat patients afflicted with COVID-19, as well as other maladies, which is of critical importance. So this was, in essence, a call to action to the medical community to assist with the state's response to COVID-19, which was the evil Governor Pritzker was seeking to be remedied. Counsel, we also have Executive Order 2020-37, where there is specific language regarding what's not included or what it entails. Is that relevant? How do we consider that? What role does that play in our analysis of any? Thank you. I appreciate the question. The Executive Order 20-37, for one, I would submit to the court that is, in essence, a red herring. Because when we're employing the canons of statutory construction, we're to construe all the language and the relevant provisions that existed in the executive order. So, for one, it is a practical matter. You shouldn't consider something that didn't even exist at the time Executive Order 2019 was issued on April 1st, 2020. That would be number one. I think, in addition, you'd have to consider the fact that this was a fluid situation that was evolving by the day. The guidelines and whatever the current recommendations were for how to combat or treat the COVID outbreak was evolving, which would necessitate perhaps a different response. But what didn't change was the fact the Governor was seeking an immediate response to COVID-19. But what was required, or at least what constituted rendering assistance, did change. We said that in a brief, juxtaposing the differences of what rendering assistance must include. So, on April 1st, 2020, rendering assistance must include one of those three things that I stated previously. But on May 13th, 2020, every single one of those things had to have occurred in addition to some additional criteria that is stated in Executive Order 37. But even if the Court is to consider the language of Executive Order 37, I think it becomes abundantly clear that the relatedness requirement was always intended by the Governor. And this is why, in the sixth whereas provision of Executive Order 2037, the Governor states that it's the evolving situation which necessitates a different response or a unique response for hospitals, health care providers, and first responders. Health care facilities was not included in that. And if we look at Section 5 of Executive Order 2037, there was a relatedness requirement explicitly stated there. So if the response to, or if the rendering assistance that was required or expected for health care facilities didn't change or hadn't evolved between April 1st, 2020 and May 13th, 2020, then what, I think it would be fair to say, what was stated in that order with respect to health care facilities in Section 5 would apply or at least can be considered to show that a relatedness requirement was always present. As I was stating previously, Your Honors, the language that was employed in Executive Order 2019 has to be considered in the entirety of the language that was employed. And what Governor Pritzker stated in Section 3 of Executive Order 2019 was that he was targeting immunity for injuries and deaths that occurred, quote, at a time the health care facility was engaged in the course of rendering assistance to the state by providing health care services in response to the COVID-19 outbreak. That's in Section 3. So what we are asking the Court and what we implore the Court to do is to consider that language, but not just some of that language, all of it, and give it its plain and ordinary meaning, which the canons of statutory construction also require the Court to do. With respect to the at-a-time language, that's limiting language. So what that is telling us when we look at the fact that Governor Pritzker included at-a-time in EO 2019 means he was immunizing negligent conduct that occurred when the health care facility was providing the COVID-19 assistance. It does not mean storing a box of PPE on one day would grant immunity for negligent conduct that occurred a week later. Engaged in the course of language further clarifies what specific situation the Governor was specifically targeting. Injuries that occurred when the facility was rendering assistance to the state through the provision of COVID-19 assistance with respect to the outbreak. I see my time is almost up, Your Honor. There was an additional point I wanted to make very briefly in that the appellate court should have provided more credence or given more credence to the amicus brief that was provided by Attorney General Grosvell in this case. And the reason for that is this. General Grosvell was the chief legal officer in the state of Illinois. He is the lone representative for the state. And what he did was he came to the appellate court, provided an amicus brief, and he stated that the immunity that Governor Pritzker had conveyed was not boundless. It was, in fact, limited. Well, counsel, was that Monday morning quarterbacking? I mean, you know, it's easy to say now, oh, that's what we meant, but where does that come into play for us, really? I don't think it's Monday morning quarterbacking, Your Honor. What I think is also important to consider in that brief is that's not all Attorney General Rose said. He also said that the court needed to employ the candidates of statutory construction when construing EO 2019 and do it in a manner that avoids absurdity, inconvenience, or injustice, which is why we highlighted those hypothetical scenarios on page 13. Of her brief that would be using Ria's interpretation of the executive order to highlight exactly the types of absurdities, injustices, and inconvenience that are guaranteed to result if it doesn't matter if the actual provision or providing of health care services related to COVID-19 even occurs. I have a few moments left. If there's any questions, I'm happy to answer those. Otherwise, I would reserve my time for rebuttal. Thank you, Your Honor. Thank you very much, counsel. Counsel for the affidavit. May it please the court. Good morning, Your Honors. Counsel, Robert Chalmers for the defendant appellee, which I will refer to as Ria. I'd like to introduce Mr. Ari Kirshner, who is with us on the briefs. He's from McCabe, Kirshner & Lincoln. Justice Holder-White, you asked the first questions of appellant's counsel, and I'll answer that question first. You asked about the plain language. Counsel then goes to the canons, but he says it's not ambiguous. You use canons of statutory construction if there's an ambiguity to arrive at what the meaning is. You can't have it both ways. You don't need it. And he said Executive Order 2019 is not ambiguous. He called it clear. Statutory construction is not necessary. And if there was to be statutory construction, there isn't a case in Illinois on what the statutory construction is for an executive order. But a lack of precedent is of no moment in this court because one of you will offer a decision that will say what the canon is for the construction of an executive order. Chief Justice, you asked about Rule 308. Counsel said the court should consider the original Rule 308 question. That was rejected by Justice Hutchinson writing for the Second District, not because it was wrong, but because of the use of the word blanket. And frankly, it was a matter of terminological differentiation because the question as posed took out the word blanket because the appellate court thought that blanket would extend not only to negligence but willful and wanton. Brea always contended that the immunity only applied to negligence. The court below pointed out that it was not limited to the question as certified by the tribal court. And it cited this court's decisions in Moore and in Ross Magali. And the question is relatively straightforward, as I think the Chief Justice pointed out. Does executive order 2019, which triggered the immunity and the reference to the I.E.M.A. grant immunity for ordinary negligence claims to health care facilities that rendered assistance to the state during the COVID-19 pandemic? The court answered the question, yes. Now, one thing I want to point out. Yes, ma'am. I want to make sure I'm clear. So at this point, it is not your position that it extends beyond negligence. You're not, that's not your position. That is not our position at all. So whatever question we decide to answer, you're not suggesting it goes beyond negligence. No, in fact, it's what 21C of the I.E.M.A. provides, which is immunity for civil liability for negligence with an exception for willful and wanton, which is what the executive order would speak to. The plaintiff wrote a rather unusual brief. The word error in the opening brief is used once. Erroneous is used once. The reply brief refers to error once. What they want is for this court to reverse because they claim in their opening brief, in their reply brief, and in the petition for leave to appeal that the appellate court didn't answer the question, which is demonstrably false. And that, as you heard Mr. Wormald say, they didn't pay enough credence to the attorney general's amicus brief. This court can accept amici briefs. It's a privilege to be before this court. It's not a right of anyone. That being said, you don't have to follow what the amici write. We suggest here that you not follow what it will write, but I'll get to that in a moment. The position of the amicus is to offer the court suggestions based on their position in society that would aid the court to decide the case. I'll go to Justice Cunningham, your question. You asked what's the source of the immunity. We submit to the court that the source of the immunity is section 21C of the IEMA, which confers immunity for civil liability in the course of a disaster or emergency. The governor, using that as the basis, issued Executive Order 2019. Justice Holder-White, you asked the second question of counsel for the plaintiff about health care services, and his answer was to be immunized, the rendering assistance or the negligence, and negligence had to occur at the time. The Executive Order says at a time. At a time is broader. At the time is a specific limitation on when the immunity would apply, and that's not found in the Executive Order. Chief Justice, you asked the question about a question of law. There is only a question of law before this court. What Brea did or did not do is arguably a question of fact, and Justice Holder-Street, yes, the 2619 motion to dismiss was denied. Yet the court found itself in a position that in order to maturely advance the ultimate termination of this case, as required by Supreme Court Rule 308, certified a question which the appellate court accepted about whether that, in the words of that order, there was blanket immunity for negligence in connection with rendering assistance to the state. Counsel, can I ask you just to refer back to the limiting language? So is it your position that at a time when a health care facility is engaged in the course of rendering assistance, that that encompasses a, the scenario counsel posed about storing a mask one week and having someone pass or be afflicted the following week? I mean, is it at a time to the entire period of time during the Executive Order, which would have been April 1st to May 13th? Well, the April 1st to April 30th then extended by Executive Order 20-33 to May 29, 2020. And the answer is yes. There is no temporal limitation. It is at a time during an emergency, which there was. The Executive Order was tied into the gubernatorial disaster proclamation that gave, that the governor used as a basis to commandeer health care facilities to go to work, to assist the state, to provide extra beds for hospitals, and to do various things. Bear in mind, these people went to work when their neighbors stayed home. This was a time you couldn't get a hamburger in a restaurant. You couldn't get a beer in a bar. You couldn't go to church on Sunday. And yet, these health care workers went to work at a time when they didn't know the extent of the novel coronavirus. No one did. As time went on, it was discovered there were different ways to treat it. By September of 20, there were vaccines that were only talked about back in the spring of 20. These people were the health, they were health heroes, if you will. As I said, they went to work because, in part, they were immunized. Immunized for ordinary negligence that may occur while overworked and exposed to the coronavirus, the same as the patients in the nursing home. So, yes, there was a window of time during which care arose. They were rendering assistance to the state during the emergency, as declared by the governor, and not at the time. At the time would be the precise time the negligence occurred. That's not what the order says. It says at a time, which is a broader approach to the rendering assistance concept. That's part of the problem here. We don't know what the plaintiffs want. My question is, so you're saying that at a time means the entirety of the period of time covered by the executive order? Yes. Counsel, I have another question. If the, if IEMA controls and not the executive order, assume for a moment, you know, that was your answer. You thought the Emergency Management Act was, that's the controlling statutory term and not the executive order. The executive order simply triggers IEMA. Is that what you said? If that's the case, why do we need a, what's the point of the certified question? Well, the certified question was to the extent that... I mean, if the statute that's triggered is clear, and we're assuming that the executive order triggers the statute, then isn't it just a question of applying the facts to the law, applying the law to the facts and seeing whether or not willful and wanton conduct was afoot? I mean, I'm trying to figure out what's the point of the certified question if the Emergency Management Act is the controlling statutory provision. Well, the Emergency Management Act gave the governor the authority to enter an executive order to commandeer health care facilities to assist the state in exchange for the immunity provided in the executive order, as well as in 21C of the IEMA. The IEMA provides the immunity, not the executive order. The executive order simply activates, if you will, the Emergency Medical, the Emergency Management Act. Yes. So, again, if that's the case, I mean, the IEMA is pretty clear. So if it's, if that's the sequence of events, why do we need a certified question? What's the point of the certified question? Well, I think the appellate court clarified that the, you have to look to the statute, and what the statute confers is what controls, because you derive the immunity not from the executive order, but from the statute that led to the executive order. And we have the benefit of the appellate court's decision, which we did not have at the time we asked Judge Bowles to certify that question of law. I think the appellate court, terminologically changing the order, made it clear, does the executive order, looking at the language, which triggered the immunity provided in the IEMA, grant immunity for ordinary negligence? At the time, we were dealing with issues from the plaintiffs as to the constitutionality of what the governor did. Those issues are not before this court now, nor would they were tried to be brought before the appellate court, but they were rejected by the court. In fact, every argument the plaintiffs have made was rejected by the appellate court, including relatedness and the temporal concept. The appellate court said the order does not speak to limitations, conditions, or exceptions, except one, willful and wanton conduct. Let me ask you this, and I suspect you were not there in the trial court when this question was drafted, but perhaps you know the background. Apparently, there was a motion to dismiss, and it was denied by the trial court, and then Brea filed a motion to reconsider, and the court changed its mind. I think that's correct. And then Brea, I think this is right, Brea submitted the question for certification. I'm just wondering, you know, we've asked a lot of questions about what is the question and really what is it that we're trying to look at here. Do you have a sense, can we see in any trial record, how did this question get framed the way it did? In other words, certainly Justice Cunningham is asking a number of questions. Why are we here? What is this, the purpose of this question? Your opponent suggests that there's a lot more going on below the surface of this question. How did we get here? Did the parties draft this? Yes. The question, the language of blanket immunity? Yeah. Yeah. I was involved in the drafting of that question. Okay. With respect to, well, your typical 308 motion, we ask the court to certify a question of law for immediate appeal, submit a question, or suggest that the court certify a question of its own. And the question that we submitted was approved by the circuit court. The court certified the question. Plaintiff then moved forward, reconsideration of that ruling. It was denied. We then filed a petition for amendment to appeal under Rule 308, which was granted. There was no oral argument in the appellate court. They ordered no oral argument in February of 2023, issued their decision six months later in August of 2023, without hearing from the attorneys. And the court, as you can see in the opinion, modified the question, which it said it couldn't do, and it cited various cases from this court permitting that. We have a situation here where, as it was mentioned earlier, the plaintiff does not argue, any of the plaintiffs do not argue anywhere that the appellate court was wrong. They don't do that. The entirety of the brief of appellants is an attack on brevity. It's an ad hominem argument that really is quite unusual because, as the appellant, usually the mantra in an appellant's brief is the appellate court was wrong. The appellate court erred. The appellate court misapplied the law. It misconstrued the fact. It didn't look at the record. No. Nowhere. Their challenge is against BREA and what BREA contends. What BREA contends is the order of 2019 does not admit or speak to a limitation as to any requirement other than one singular limitation. That is, it doesn't apply to Wolf and Wonk conduct, and the rendering assistance must occur during the gubernatorial disaster proclamation, which it did. We're not concerned here with what BREA did because we're not arguing a summary judgment or a 2619 motion. That already occurred. What we are looking at here is the executive order, and not with the machinations that the plaintiffs throw at this court. Counsel, what do you mean by what we're looking at is the executive order? Plain language, Your Honor. The executive order triggers the IEMA statute. And so shouldn't we be looking at what the statute says once the statute is triggered by the executive order? They dovetail. They dovetail for, at a time, rendering assistance to the state for a declared emergency or disaster. And it extends immunity for civil liability for any act or omission for any injury or death. The executive order, in many respects, tracks 21C of the IEMA. It's clear. The plaintiff admitted it was clear and yet wants statutory construction to be done, which is unnecessary. And the plaintiff says, look at the title. It says, executive order in response to COVID-19. Well, that's selective and erroneous. And 2037 was raised, and if I have a minute, I'll address that. 2037 shows that the governor knew how to add a limitation on immunity if he wanted to. 2037 section 3 is virtually identical to section 3 of the executive order 2019. Language is almost the same. It's in connection with hospitals that do not perform elective surgeries. Section 4 of 2037, which dealt with elective surgeries, in effect said the immunity would apply if the act or omission was related to treatment, transmission, or one other factor of COVID-19. It was not only was there a relatedness requirement, it used the word related in section 4. So it shows that the governor knew how to add a limitation if he wanted to. He didn't. And to say that there's some ambiguity in 2019 would carry over to an ambiguity in 2037, which is quite clear. And for all of these reasons, Your Honors, unless there are other questions, I respectfully ask the court to affirm. Thank you very much, Counsel. Rebuttal? Your Honors, to start, I would like to first address how we got here. That's a question that came up a couple times. We got here because the 2619 motion was denied by Judge Bowles. What BREA was seeking was immunity due to the simple fact they did one of the three things in section 2 of EO 2019. Had no bearing on whether they actually provided medical services in response to COVID-19 or not. The position that was advanced was if you render assistance as defined in section 2 of EO 2019, you have immunity. We took issue with that, which is, again, how we got to this blanket immunity language that was incorporated into the executive order. But that was not language that the appellants had provided. That was a question that was drafted by BREA and submitted to the court. That blanket immunity language was maintained by the trial court. It was modified very slightly with respect to striking a few words on the back end of the certified question. But the blanket immunity language of what BREA advanced, and I think it's kind of revealing that my opponent couldn't give a clear answer of exactly how we got here and what is exactly the point. What's the purpose of this certified question? With respect to the issue as to the lack of claiming the appellate court committed error, there was a mistake that happened when the question was provided to the second district. That's just false. It should be clear from our brief that the error was the failure to carry out the canons of statutory construction when it came to interpreting EO 2019. The court specifically stated in its opinion that we need not parse the language of EO 2019 too closely. That is error because that flies in the face of the cardinal principle of statutory construction. We're construing an executive order in this case. We have to figure out what the intent of the drafter was and what's the best indicator of the drafter's intent. Is it your position that there is an ambiguity in the order, the executive order? I appreciate the question because I want to make sure I'm clear on that. There is an ambiguity. What I was saying was that her position is after you carry out the canons of statutory construction and you read all of the words Governor Pritzker had employed, and then also consider the other factors the court is supposed to do. Considering the order one way or the other with respect to how it is deployed. Is employing it a certain way going to lead to an absurdity or an injustice or not? It's also true and incorporated within the canons of statutory construction that a literal reading of the statute that would lead to an absurdity or an injustice doesn't have to be followed. That's not required. But you are suggesting that we need to go beyond the plain language. Yes, yes I do. I think you need to first consider the plain language of the statute, but then you should go beyond that. Why would we go beyond it if the language is plain? Are the actual words ambiguous? I think the words are ambiguous due to the rendering assistance provision, the provision of health care services in response to COVID-19. Those terms are not defined in the executive order. And the executive order in section two again states that rendering assistance must include, but it's not all encompassing. It doesn't say rendering assistance means. So we have to dig a little bit further and run through certain scenarios of what would in fact occur if we construe the statute or employ it in a manner one way or the other. So you're saying that the words themselves are ambiguous? Yes, yes. And we had this discussion about whether or not the statute triggers what the governor did in the executive order or whether or not it provides authority for the governor to issue the executive order. Does it really matter? I want to make sure I'm understanding your question. So you said that basically the IEMA statute provides the governor authority to issue the executive order. Yes. Opposing counsel said that we're not looking at the executive order, we're looking at the IEMA statute. Why does it matter? Well, it matters because the original certified question that Bria provided to the court wasn't asking about IEMA. It was asking about executive order 2019 and whether executive order 2019 bestowed this broad swath of immunity that they believe it actually provided them. And this is the other important reason, again, why we highlight those absurdities that would result if you construe the statute in a manner or the executive order in a manner that would read or lend itself to only requiring the addition of a bed, the storing of PPE, or the preparation to treat a COVID patient. The healthcare facility to be immune wouldn't actually have to provide any assistance to the state. And we have to find the statute is, I mean, well, the order is ambiguous in order to get to whether or not it would lead to absurd results. Is that right? That's right. Yeah, that's right. But the statute's not ambiguous. You're not asking us. The executive order. But the statute. You're not challenging the statute in any way. I'm kind of following up on the question of why does it matter which we're looking at. If the statute authorizes the governor to act in certain situations and he does act and he frames his action in one way or another, does it matter whether we're analyzing the statute or analyzing the executive order? Are they in conflict in some way? I think it does. For the reason I stated earlier, perhaps I wasn't clear enough when I stated it, but the IEMA is the mechanism. That's the authority that provides the governor with the ability to issue that executive order. But Governor Pritzker doesn't have to use the full extent of whatever his authority is when he issues an executive order. He could walk that back and narrowly tailor specifically what he is trying to target and what benefit he's seeking to provide. And in this case, again, it was a call to action to the state's allies that rose to the occasion, stepped up to the plate, and actually provided COVID assistance to combat the COVID-19 outbreak. It wasn't enough that you store a box of PPE in the linen closet and you're negligence-free. That wasn't the case. That would be a complete inconsistency and an absurdity that this court shouldn't find. I see my time is almost up. If there are any other questions, I'm happy to take those at all. Thank you very much. Okay, thank you. We will rest on the point set of three, and we thank the clerk for his time. Thank you very much. Agenda number 11, number 130042, Donald James, etc., versus Geneva Nursing and Rehabilitation Center, will be taken under advisement. Thank you both for your arguments.